NOT DESIGNATED FOR PUBLICATION

No. 123,466

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

EDWARD D. HARRIS JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed December 30, 2021.
Affirmed.

*Jacob Nowak*, of Kansas Appellate Defender Office, for appellant.

*Tara Terwilliger*, legal intern, *Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district
attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., SCHROEDER and CLINE, JJ.

PER CURIAM: Edward D. Harris Jr. was charged with three counts of aggravated
indecent liberties with a child. Three days before his trial, he received a plea offer from
the State, which he accepted on the morning of trial. After entering an *Alford* plea to three
amended charges, Harris filed a presentence motion to withdraw his plea. The district
court denied Harris' motion, which Harris now argues was an abuse of discretion.

After examining the record and thoroughly considering the arguments of the
parties, we find no error and affirm the district court's decision.

1

Harris was charged with three counts of aggravated indecent liberties with a child for incidents occurring between August 2015 and February 2018. Harris retained attorney Mark Schoenhofer, who entered his appearance in April 2018. Harris' jury trial was originally set to occur on April 22, 2019. Following a series of continuances requested by both Harris and the State, Harris' jury trial was rescheduled for March 9, 2020.

In the days before trial, Schoenhofer received a plea offer from the State. He met with Harris to discuss the proposed plea agreement, which Harris rejected. But the morning of the trial, Harris told Schoenhofer he changed his mind. Harris then told the district court he had accepted a plea agreement from the State and waived his right to a jury trial. The court released the potential jurors, and the State released its witnesses.

The district court recessed for 90 minutes, so the State could prepare and file an amended information modifying the charges. Harris agreed to enter an *Alford* plea to the amended charges, and, in exchange, the State agreed to make certain sentence recommendations. See *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

The district court discussed the terms of the plea agreement with Harris to ensure that he understood them. The court asked Harris if he was being threatened or forced to plead guilty and if he was satisfied with services of his attorney. Harris responded that he understood the terms of his agreement and stated he was not being forced to accept the agreement. He also said he was satisfied with his attorney. The district court accepted Harris' *Alford* plea and set sentencing for April 2020.

Before sentencing, Harris moved pro se to withdraw his plea. He argued good cause existed to withdraw his plea because:  (1) He was not represented by competent

counsel during the plea process, (2) Schoenhofer coerced him into entering his plea, and (3) he did not knowingly enter the plea because he was not given sufficient time to consider the offer. Harris argued that a combination of a lack of sufficient communication between him and Schoenhofer and time pressure effectively coerced him into accepting the plea agreement. He claimed that he was forced on the eve of trial to accept a plea agreement or go to trial with an attorney who he claimed was unprepared to mount a defense. Harris also alleged that Schoenhofer had called him a fool, told him that he had no defense, and threatened to withdraw from his case to get him to accept the plea agreement.

The district court held an evidentiary hearing on Harris' pro se motion, where Harris was represented by substitute counsel. The district court heard testimony from both Harris and Schoenhofer.

Schoenhofer testified that he had practiced since 1993, mainly as a criminal defense attorney, and had extensive experience defending clients charged with high-level sex offenses. Schoenhofer met with Harris shortly after being hired and asked Harris to send him additional information by letter. Harris sent him detailed letters with facts about his case and potential witnesses. Schoenhofer reached out to every witness that Harris identified but some of the witnesses did not respond to his calls. Schoenhofer also testified that Harris' father acted as a channel of communication, and Harris had given Schoenhofer permission to discuss the details of the case with his father. Schoenhofer met with Harris in person six to eight times, besides communicating with him through letters and his father. He said he received full discovery, reviewed all of it, and shared any discovery with Harris that was necessary. He also hired an experienced private investigator to assist him on the case shortly after being retained. He testified that he kept Harris informed of any important developments in his case.

Schoenhofer said he always approached the case as if it were most likely going to trial and had prepared cross-examinations of key witnesses, opening statements, jury instructions, and voir dire in anticipation of trial. He also filed pretrial motions. He explained that the weekend before the trial, he received a plea offer from the State, which he believed to be a "great offer," since it greatly reduced Harris' potential sentence. He met with Harris twice over the weekend to discuss the plea offer, once for an hour and a half and once for two and a half hours. He tried to persuade Harris to take the deal, since he believed the recording of Harris' initial interrogation by police was fatal to Harris' case. He told Harris that he believed the State might withdraw the offer if he did not accept it by the time the trial started. He also informed Harris' father there was a plea offer and advised him to encourage Harris to accept the offer. He did not remember if he called Harris a "fool," but said he felt it was foolish for Harris not to take the plea seriously. Schoenhofer said that in between his last meeting with Harris and Monday morning, Harris' father contacted him and said Harris wanted to accept the plea offer. He received the written plea agreement from the State on Monday morning before trial and presented it to Harris to review and discuss a final time before Harris ultimately accepted the deal.

Harris testified that he met with Schoenhofer "probably six or seven" times, usually before court appearances or filing continuances. He stated that most of the meetings were for 5 to 10 minutes. Although he wrote letters to Schoenhofer, he claimed he was not given sufficient opportunity to fully discuss the facts of his case or communicate possible defenses. Harris confirmed that Schoenhofer met with him on the Friday before trial and once more over the weekend to discuss the plea offer. He said Schoenhofer went through the deficiencies in his case and encouraged him to accept the offer. Still, he told Schoenhofer he believed in their chances to win at trial. He said Schoenhofer was forceful in trying to persuade him to accept the offer and told him he would be a fool to not take the offer.

4

Harris testified that he did not receive a written copy of the plea agreement until 20 minutes before his trial was set to begin. He claimed he told Schoenhofer at that time that he still did not want to take the plea. He said he asked Schoenhofer what their defense would be, and Schoenhofer replied by shrugging his shoulders and saying "exactly." He testified that at this point he "felt like [he] had no choice" but to accept the plea. Based on the time limit Schoenhofer believed was attached to the offer, coupled with Harris' allegation that Schoenhofer suggested he was not prepared to mount a defense, Harris felt that accepting the plea agreement was his only chance to escape a life sentence. Harris also testified that he believed Schoenhofer used his father to influence him since Schoenhofer knew that his dad was his "anchor."

When the State asked Harris what information was missing that prohibited him from entering a knowing plea, Harris explained that he did not fully understand the lifelong registration requirements under the plea agreement. Harris also gave a description of the defenses he believed Schoenhofer should have developed and a list of witnesses Schoenhofer should have contacted. This description matched the defenses that Schoenhofer described investigating and the list of witnesses that Schoenhofer said he contacted.

After a brief recess, the district court announced its ruling from the bench. The district court began its ruling by noting that under K.S.A. 2020 Supp. 22-3210(d)(1), Harris could withdraw his plea if he made a showing of "good cause." The district court explained the Kansas Supreme Court in *Edgar* had interpreted that term, providing three factors to consider in determining whether a defendant had shown good cause to withdraw his plea: (1) whether the defendant was represented by competent counsel, (2) whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of, and (3) whether the plea was fairly and understandably made. *State v. Edgar*, 281 Kan. 30, 36, 127 P.3d 986 (2006). The district court also explained that under the first factor, it needed to apply the two prong *Strickland* test in determining whether Harris was

5

represented by competent counsel. See *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Applying *Edgar* and *Strickland*, the district court denied Harris' motion, finding that Schoenhofer provided competent and effective representation and did not coerce, mistreat, or unfairly force or coerce a plea from Harris and that Harris knowingly and understandably entered his plea. As a result, the court found Harris had not presented sufficient facts or evidence to meet his burden to show good cause to withdraw his plea.

The district court explained its ruling, starting off by stating that Schoenhofer was experienced in handling this type of case and qualified to do so. The district court noted that Schoenhofer met with Harris six to eight times, requested that Harris send him letters providing details on his case, and followed up on the information provided by Harris. The court explained that while Schoenhofer may not have spoken with every witness, he had subpoenaed "most if not every" witness identified by Harris. Schoenhofer received full discovery, reviewed all the evidence, and hired a private investigator to assist him with the case. He was also prepared for the case to go to trial, having prepared opening statements and cross-examinations for key witnesses, and successfully argued a difficult pretrial motion. Schoenhofer also demonstrated a detailed understanding of the facts of the case and Harris' potential defenses, and his trial preparations lined up with Harris' desired trial strategy. The court also pointed out Harris admitted he was satisfied with Schoenhofer's performance at the plea hearing.

As for the plea agreement, the district court noted that Schoenhofer described the plea agreement as a great offer, and Harris would only serve 136 months in prison under the agreement, rather than a potential life sentence under the original charges. The district court explained its finding that Harris was not coerced, noting there was no credible evidence that Schoenhofer or Harris' father had coerced Harris to accept the agreement, or that Schoenhofer had control over Harris' father. The district court found that although

6

Schoenhofer may have been "pretty strong" with Harris in trying to persuade him to accept the agreement, that may have been what was required of him as a good lawyer in that moment, given the circumstances. The district court also explained that although Harris argued he was not presented with the written plea agreement until 20 minutes before his deadline to sign it, the record showed Schoenhofer presented Harris with the terms of the agreement over the weekend and there was a 90-minute recess at the plea hearing during which Harris had more time to review the agreement before he pled. The district court also pointed to the fact that Harris confirmed he understood the terms of the plea agreement at the plea hearing.

Before sentencing, Harris renewed his motion to withdraw his plea. The State responded by urging the district court to make further findings on the matter applying the lackluster advocacy standard laid out in *State v. Herring*, 312 Kan. 192, 474 P.3d 285 (2020), which was issued while sentencing was pending. In *Herring*, the Kansas Supreme Court announced that *Strickland* was not the appropriate test to apply under the first *Edgar* factor. *Herring*, 312 Kan. at 198. The district court acknowledged the court's ruling in *Herring*, reopened its ruling on the motion, and entertained further argument from the parties.

In support of his motion, Harris argued that Schoenhofer's advocacy was lackluster in that he failed to communicate regularly with Harris, failed to gather evidentiary items and follow leads provided by Harris, and used coercive tactics to get Harris to accept the plea agreement, including calling him a fool and putting Harris under time pressure to accept the agreement. The State responded by arguing that Schoenhofer provided effective assistance since he had followed up on all the information provided by Harris and was prepared for trial.

The State concluded by comparing the lackluster advocacy standard under *Herring* with the *Strickland* test:

"I was confused by the *Herring* decision, frankly, because I have always looked at *Strickland* as a higher standard than the lower lackluster advocacy standard that the court says you have to apply. So if you found *Strickland*, you by definition found above and beyond the lackluster advocacy standard. I guess in form over function I'm asking the Court today to find that there was no lackluster advocacy by Mr. Schoenhofer. Quite the contrary. It was robust and successful advocacy on his part."

The district court began its analysis by agreeing with the State that the lackluster advocacy standard was an easier standard to meet than the *Strickland* test, and thus a finding that the *Strickland* test was met would satisfy the lackluster advocacy standard. The district court noted the Kansas Supreme Court had not provided a precise legal definition for the standard but had identified the Websters New World College Dictionary 812 (5th ed. 2014) definition of lackluster as "'lacking energy or vitality, boring, unimaginative.'"

The district court held that, applying the lackluster advocacy standard, its ruling would not change and laid out the basis for its finding. The court again noted that Schoenhofer demonstrated he had gotten to know Harris and had shown attention to detail and a knowledge of his client's background in his testimony at the evidentiary hearing. The court also repeated that Schoenhofer had met with Harris eight times, recorded his interviews with Harris, and had asked Harris to send him detailed letters describing potential witnesses. The court again noted that Schoenhofer testified at the evidentiary hearing that he subpoenaed each witness, reviewed all necessary files, and hired a competent private investigator to help prepare for trial. And the court acknowledged that Schoenhofer's testimony showed he was prepared for trial before Harris accepted the plea agreement, including the fact that Schoenhofer successfully argued a difficult pretrial motion, preventing the admission of damaging evidence. The court pointed out Schoenhofer met with Harris at length twice over the weekend before trial to discuss the plea agreement but did not coerce Harris into accepting it. And, again, it pointed out Schoenhofer admitted he advised Harris and Harris' father that Harris

8

should accept the plea agreement but did so because he felt "very strongly that his client should take what he thought was a very good deal."

Based on these findings, the district court held there was "no evidence of lackluster advocacy on the part of Mr. Schoenhofer" and denied Harris' renewed motion to withdraw his plea. The court followed the parties' sentencing recommendation under the plea agreement.

ANALYSIS

We review a district court's denial of a presentence motion to withdraw a plea for an abuse of discretion. A district court abuses its discretion if its ruling is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. The burden of establishing abuse of discretion falls on the defendant. *State v. Frazier*, 311 Kan. 378, 381, 461 P.3d 43 (2020).

Harris first argues the district court abused its discretion because he claims the district court applied an erroneous legal standard in denying his motion. In Harris' view, the court applied the lackluster advocacy standard in name only. He alleges the court's discussion of the relationship between the *Strickland* and lackluster advocacy tests shows the court failed to appreciate that Harris was required to make a lesser showing under the lackluster advocacy standard. Thus, Harris claims the court did not properly apply the lackluster advocacy standard in dismissing his motion.

K.S.A. 2020 Supp. 22-3210(d) allows for the withdrawal of a guilty or nolo contendere plea at the discretion of the district court. But the statutory standards for granting withdrawal differ depending on the timing. If the request is made before sentencing, the plea may be withdrawn for "good cause shown." K.S.A. 2020 Supp. 22-

9

3210(d)(1). If requested after sentencing, the plea may be withdrawn only "[t]o correct manifest injustice." K.S.A. 2020 Supp. 22-3210(d)(2).

In exercising its discretion under K.S.A. 2020 Supp. 22-3210(d), the district court should evaluate whether "'(1) the defendant was represented by competent counsel, (2) the defendant was misled, coerced, mistreated, or unfairly taken advantage of, and (3) the plea was fairly and understandingly made.'" *Edgar*, 281 Kan. at 36. Whether a defendant moves to withdraw his or her plea before or after sentencing affects how a district court applies the *Edgar* factors. When a defendant moves to withdraw a plea after sentencing, a district court must use the ineffective assistance standard under *Strickland* to consider the first *Edgar* factor. But when the same motion is made before sentencing, the court applies the lower lackluster advocacy standard. *Herring*, 312 Kan. at 198.

While the court in *Herring* did not say definitively what sort of conduct might constitute lackluster advocacy, it noted the dictionary definition of "'lackluster'" means "'lacking energy or vitality; boring, unimaginative, etc.'" 312 Kan. at 201.

Although the *Edgar* factors permit counsel's competence or lack thereof to be one consideration when the motion is filed before sentencing, they should not be mechanically applied to demand that a defendant demonstrate ineffective assistance arising to the level of a violation of the Sixth Amendment to the United States Constitution. *State v. Aguilar*, 290 Kan. 506, 512-13, 231 P.3d 563 (2010). Mere "lackluster advocacy" may be enough to support the first *Edgar* factor and thus statutory good cause for presentence withdrawal of a plea. All of the *Edgar* factors need not apply in a defendant's favor in every case, and other factors may be duly considered in the district court's discretionary decision on the existence or nonexistence of good cause. *Aguilar*, 290 Kan. at 513.

*Herring* and *Aguilar* make clear that a defendant need not make the showing required under *Strickland* to succeed on a presentence motion to withdraw plea based on allegations of incompetent counsel. A defendant need only show that counsel provided lackluster advocacy. In considering such a motion, a district court should consider the *Edgar* factors holistically in determining whether the defendant has shown good cause to withdraw the plea.

We do not find Harris' arguments that the district court erred persuasive. While the district court applied the "stricter" *Strickland* standard at the first hearing, it properly applied the "lower" lackluster advocacy standard at the later hearing. The court discussed the facts in detail at both hearings, ultimately noting "[t]here was absolutely no evidence of lackluster advocacy" on the part of Schoenhofer. The court understood the lackluster advocacy standard was a lower standard than the *Strickland* test and did not simply rely on its findings at the first hearing in disposing Harris' motion. Instead, it laid out the facts in support of its belief that Schoenhofer had provided zealous and competent advocacy. Furthermore, other than first applying *Strickland*, the district court applied the remaining *Edgar* factors correctly in deciding Harris' motion and did not mechanically rely on the first factor in deciding Harris' motion. As a result, we find the district court's ruling was not based on an error of law.

Alternatively, Harris argues that if the district court did indeed apply the lackluster advocacy standard in making its ruling, the resulting decision was arbitrary and unreasonable. He claims that, given how long Schoenhofer represented Harris, no reasonable person would find the sparse amount of communication and "last minute" presentation of the plea deal to Harris did not amount to lackluster advocacy. Harris notes that Schoenhofer represented him for 691 days in total but did not communicate the State's plea offer to Harris until 3 days before trial. Harris argues that defendants should not be expected to reach a plea decision in an off-grid case over the span of a weekend

11

and cites caselaw holding that attorneys have a duty to promptly communicate plea offers to their clients.

To meet his burden on this argument, Harris must establish no reasonable person would have taken the view adopted by the district court. *State v. Gonzalez*, 290 Kan. 747, 755, 234 P.3d 1 (2010). Harris does not meet this high standard.

While Harris argues Schoenhofer's communication was sparse, the record shows Schoenhofer met with Harris six to eight times in person over the almost two years before the trial, and he also communicated with Harris by letter and through Harris' father. Harris has not alleged Schoenhofer declined any request by Harris for a meeting, nor has he explained what more in person meetings would have accomplished. The record shows Schoenhofer fully understood Harris' desired trial strategy and investigated it thoroughly, contacting all the witnesses identified by Harris and interviewing enough of them to determine he did not think it was viable. And while Harris may have wanted more time to weigh his options, there is no evidence that Schoenhofer delayed in communicating the plea offer to him. Schoenhofer testified that he communicated the offer to Harris shortly after receiving it on the Friday before trial. And he reasonably concluded the State might withdraw the offer if Harris did not accept it by the time the trial began on Monday and told this to Harris.

A reasonable person could find on these facts that the advocacy provided by Schoenhofer was not lackluster. As a result, we find the district court did not abuse its discretion.

Affirmed.

12